UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

James Moran,

    Plaintiff,

  vs.        REPORT AND RECOMMENDATION

Freeborn County Jail,
R.N.C. Donna A. Peterson,
Sheriff Mark Harig,

    Defendants.   Civ. No. 05-391 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment.   For these purposes, the Plaintiff appears pro se, and the Defendants appear by Roger K. Rowlette, Esq.

For reasons which follow, we recommend that the Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment be granted, and that the Plaintiff's Complaint be dismissed.

## II.   Factual and Procedural Background

The Plaintiff is a Minnesota State prisoner, who was incarcerated at the Freeborn County Adult Detention Center ("Detention Center") from November 18, 2004, until April 7, 2005.  See, Affidavit of Donna L. Peterson ("Peterson Aff."), at ¶¶3-4, Affidavit of Roger K. Rowlette ("Rowlette Aff."), at Exh. R.  He commenced this action under Title 42 U.S.C. §1983, alleging that he did not receive adequate medical care during his period of incarceration at the Detention Center.  Specifically, the Plaintiff's Complaint alleges as follows:

> I have a [sic] old stab wound on my neck that keeps getting infected and my throat keeps getting swallon [sic] and infected[.]  I have hardly no teeth left in my mouth because of infection[.]  My hole [sic] body haves weaken [sic].  I was taking care of this problem before I came in[.] I need medical att[.] bad.  But they said I need insurance witch [sic] I don't have.  The nurse Donna Peterson keeps giving me a run around telling me there aint [sic] nothing wrong [.]  But my face, neck, and throat keep swanlling [sic] up real bad[.] Rochester Mayo haves [sic] files for this condition.

Complaint, at p. 4, Section V.

Based on this alleged conduct, the Plaintiff seeks declaratory and injunctive relief in the form of medical attention, as well as "compensation for damage." Id. at p.4, Section VI.

Upon the Plaintiff's Admission to the Detention Center, he was provided with a screening questionnaire for Mantoux.  In his responses to that questionnaire, the Plaintiff reported to have recently experienced "[t]iredness or loss of strength," "[f]ever, night sweats, or chills," and "[c]hest pains."  Rowlette Aff., at Exh B. Subsequently, on November 27, 2004, the Plaintiff requested to see a doctor because of swelling in his neck, and his reported belief that a wound, from a prior stabbing, had become  infected, which was making it difficult for him to eat.  Id. at Exh. C.  On November 29, 2004, the Plaintiff was examined by Donna Peterson ("Peterson"), who is a public health nurse at the Detention Center, concerning the complaints which were contained in his medical request.  During that examination, the Plaintiff reported that he had been treated at the Owatonna Hospital, in Owatonna, Minnesota, for an infection that had spread throughout his body, and that he had received an injection of some form, at the Emergency Room of the Owatonna Hospital.  Id. at Exh. D. Peterson noted that the Plaintiff had a scar on the left side of his neck, and that the Plaintiff had reported that he had undergone surgery on his neck in the past.  The

- 3 -

Plaintiff advised Peterson that he has experienced problems with swallowing for years. The Plaintiff also reported that he had a hole in his esophagus.

Based on her examination, Peterson noted that the Plaintiff did not appear to be in any acute distress; that he was not losing weight; and that his vital signs were within normal limits. Id. Peterson also obtained a Release of Information from the Plaintiff, for the Owatonna Hospital and the Mayo Health System, which is located in Rochester, Minnesota, in order to assist in the management of the Plaintiff's reported infection, and the reported hole in his esophagus. Id.

On November 30, 2004, the Plaintiff underwent an initial medical screening, during which he reported that he had been stabbed sometime in 2001; that he suffered from an infection throughout his body, as a result of the stabbing; and that he was currently under a doctor's care. Id. at Exh. A.   Subsequently, on December 4, 2004, which was a Saturday, the Plaintiff reported to staff persons at the Detention Center that he was experiencing an earache, due to an infection that had radiated from the preexisting stab wound in his neck. Id. at Exh. E.  One of the staff persons, who was identified as Sergeant Scott R. Aysta ("Aysta"), advised the Defendant that he would not be transported to the hospital for his reported earache, but that, if he completed a medical request form, he would be treated on the following Monday.  While the

- 4 -

Plaintiff initially agreed to that arrangement, he later advised staff that he could not wait to be treated.   Aysta subsequently escorted the Plaintiff to the medical unit of the Detention Center, where he took a reading of the Plaintiff's temperature.   Aysta proceeded to contact Peterson, who agreed to travel to the Detention Center, in order to examine the Plaintiff.   Id. at Exh. E.

During that examination, the Plaintiff reported that he was experiencing pain in his left ear, and that the pain was the result of the prior stab wound in neck, which he believed had caused an infection all over his body.   Id. at Exh. F.  The Plaintiff further reported to Peterson, without elaboration, that he had previously been directed to undergo an emergency surgery on his throat.   After conducting a physical examination of the Plaintiff, Peterson noted that there was no redness or edema around either ear; that there was no tenderness on either the left or right side of the Plaintiff's tragus;[1] that there was no tenderness noted on either left or right side of the mastoid area; that the tympanic membrane of both ears could easily be viewed, and they were both translucent with a good light reflex;  that there were no foreign objects in either ear; that

---

[1]The "tragus" is "the cartilaginous projection anterior to the external opening of the ear."   Dorland's Illustrated Medical Dictionary, at 1862 (29th ed. 2000).

there was a little more cerumen[2] in the left ear than the right ear; that the Plaintiff's

tonsils looked normal size without any redness; and that the Plaintiff's teeth were in

poor condition, which she attributed to an extended period of neglect by the Plaintiff.

Id.  Peterson noted that she was unable to palpate any enlarged lymph nodes in his

neck, and that the Plaintiff did not appear to have any limitation to his neck motion.

Peterson further reported that the Plaintiff's temperature was 97.1 degrees Fahrenheit;

that his pulse was 68 and regular, and that his respirations were measured at 16 and

easy.  Lastly, she noted that the Plaintiff was not having difficulties eating.  Id.

Based on her examination, Peterson authorized the staff at the Detention Center

to administer either Tylenol,[3] or Ibuprofen[4] to the Plaintiff, as needed.  Peterson also

instructed the staff to monitor Moran for any increased problems, and she advised the

---

[2]"Cerumen" is "the waxlike secretion found within the external meatus of the ear; called also earwax."  Dorland's Illustrated Medical Dictionary, at 325 (29th ed. 2000)

[3]"Tylenol" is "the trademark for preparations of acetaminophen," which is "the amide of acetic acid and p-aminophenol; a non-prescription drug having analgesic and antipyretic effects similar to aspirin, but only weak anti-inflammatory effects." Dorland's Illustrated Medical Dictionary, at 12, 1902 (29th ed. 2000).

[4]Ibuprofen is "a nonsteroidal analgesic, antipyretic, and anti-inflammatory agent that is a propionic acid derivative; used for relief of pain, reduction in fever, and in the treatment of osteoarthritis and rheumatoid arthritis."  Dorland's Illustrated Medical Dictionary, at 872 (29th ed. 2000).

Plaintiff that she would contact staff on the following day, in order to assess his condition, which she did.  Id.

On December 6, 2004, the Plaintiff filed a grievance against Peterson, concerning her "professionalism" during the examination of December 4.  Id. Peterson initially spoke to the Plaintiff concerning that examination, then she transmitted a memorandum to him, in which she advised him that she was not the person on-call for the weekend of December 4; that her responsibilities, as a public health nurse, did not require her to examine him during the evening hours of the weekend; and that it was her belief that she had gone above her duties in examining the Plaintiff on that day.  Id. at Exh. G.

On December 10, 2006, Peterson reviewed the medical records that had been received from the Owatonna Hospital concerning the Plaintiff.  Id. at Exh. H.  Those records consisted of a discharge note from the Plaintiff's admission to the Emergency Room at the Owatonna Hospital, on July 5, 2005.  Id. at Exh. I.  According to those notes, the stated purpose of the Plaintiff's admission was to address complaints of back pain, and it was reported that the Plaintiff had no other specific concerns or problems.  Following a physical examination, the impression of the treating physician

was that the Plaintiff suffered from back pain without any objective finding on examination.  The Plaintiff was discharged on that same day.

In her review of the Plaintiff's medical records, Peterson noted the absence of any "indication that [the Plaintiff] was in need of antibiotics for an infection all over his body," and the fact that, "[o]n one of [the Plaintiff's] assessment[s] for his medical request he stated his symptoms were similar to his treatment [at] the Owatonna Hospital when he needed antibiotics for an infection all over his body."  Id. at Exh. H.

On December 13, 2004, Peterson reviewed the Plaintiff's medical records that were received from the Mayo Health System.  Id. at Exh. J.  Those records consisted of a discharge summary from the Plaintiff's admission to St. Mary's Hospital, which is part of the Mayo Health System, on July 26, 2001.  Id. at Exh. K.  Those notes reflected that the Plaintiff underwent an operation to repair structural damage to his interior jugular vein, which had been caused by a stab wound to his neck, but that the Plaintiff's carotid and vagus nerves were intact, as were the Plaintiff's trachea and esophagus.  Following the surgery, the Plaintiff complained of problems swallowing.  However, after approximately four (4) days, during which time the Plaintiff was treated

with Cefazolin,[5] the Plaintiff commenced an oral diet, and had no recurrence of pain on swallowing. Id.

The Plaintiff was discharged from the Mayo Health System on July 31, 2001, at which time, he was provided with a prescription for Darvocet-N.[6]  The report further noted that the Plaintiff did not have any emergency conditions; that he was to refrain from work for two (2) weeks; and that there was no need for ongoing therapy or care.  A follow-up appointment was scheduled for the Plaintiff to be examined by a person identified as Dr. Zietlow, although it is unclear whether the Plaintiff ever attended that appointment.  Id.  In conducting her review of the records, Peterson observed that "[t]here was no information that [the Plaintiff] was released in an unstable condition or in need of on going [sic] treatment related to his throat or in need of antibiotics."  Id. at Exh. J.

On December 30, 2004, the Plaintiff completed a medical request form, in which he reported swelling and pain in his ear.  Id. at Exh. L.  Later that day, the Plaintiff was

---

[5]"Cefazolin" is "a semisynthetic analogue of the natural antibiotic cephalosporin." Dorland's Medical Dictionary, at 304 (29th ed. 2000).

[6]"Darvocet-N" is the "trademark for preparations of propoxyphene napsylate and acetaminophen."  In turn, propoxyphene napsylate is "an analgesic, structurally related to methadone." Dorland's Medical Dictionary, at 459, 1469 (29th ed. 2000)

examined by Peterson, who noted that the Plaintiff had a significant amount of cerumen in his left ear, but that he did not have any redness in his inner ear.  Id. at Exh. M.  Peterson's notes reflect that the Plaintiff had reported that he had not experienced problems with his ears in the past which, she observed, was inconsistent with his medical request of December 4, 2004.  Peterson placed Debrox ear drops[7] in the Plaintiff's left ear, which were provided to the Plaintiff from a standing order.  Id.

On both January 3, and January 5, 2005, the Plaintiff submitted requests for medical attention, in which he reported that his jaw was locking; that he was having problems swallowing; and that he was experiencing more pain.  Id. at Exh. N.  The Plaintiff also reported "white stuff."  Id.  Peterson examined the Plaintiff on January 5, 2005, at which time, the Plaintiff reported to her that he was felling better, and that the Debrox ear drops had helped him.  Id. at Exh. O.  Peterson placed five (5) to ten (10) more drops in each of the  Plaintiff's ears.  Peterson further noted that the problems that the Plaintiff had reported with his jaw were not an issue at the time of that examination, and that the Plaintiff's comment about "white stuff," in his medical

---

[7]"Debrox" is indicated as an aid in the removal of earwax.  Physician's Desk Reference for Nonprescription Drugs and Dietary Supplements, at http://www.drugs.com/PDR/Debrox_Drops.html.

request, was vague.  She also reported that the Plaintiff had discussed some of his

dental concerns with her.  Id.  Peterson directed that the Plaintiff be permitted to

request dental hygiene materials from the standing order.

On February 14, 2005, the Plaintiff completed a medical request form, in which

he reported that his throat was infected; that his teeth hurt; and that there was "green"

coming out of his nose.  Id. at Exh. P.  On that same day, Peterson examined the

Plaintiff, and made the following assessment:

> [The Plaintiff] has numerous cavities, no visible swelling to
> the exterior surface of his face, no enlargement of his
> tonsils, no halitosis, nares are patent, no visible drainage
> from his nostrils no coughing, he is eating ok, Temperature
> orally is 96.7.  Cold air bothers his teeth.  We went over
> dental request issues and what is expected from the inmate
> to help themselves [sic] regarding dental hygiene.  He said
> he does not have a Debi Tek card.  I'm not sure if that is a
> true statement.  Mr. Moran said, his mother has called
> various places for him to get dental care but nobody would
> take him.

Id. at Exh. Q.

Based on her assessment, Peterson noted that the Plaintiff had neglected his teeth for

a significant period of time; that he is a substance abuser; that he did not meet the

criteria for an emergency dental plan, at that time; and that it was unlikely that a dental

office would treat him without insurance coverage, or some kind of payment plan.  Id.

- 11 -

Peterson provided the Plaintiff with Ibuprofen, Orajel, and a warm salt water rinse, which he could request, as needed. The Plaintiff did not meet the Detention Center's criteria for emergency dental services because he did not exhibit swelling, drainage, redness, or fever. <u>Peterson Aff.</u>, at ¶6

In support of his claim, the Plaintiff has presented the Affidavits of Shawn C. Tope ("Tope"), Kevin Bass ("Bass"), and Clay Nelson ("Nelson"). Those Affidavits, which appear to have been created by the Plaintiff himself, aver, as follows:

> I [Shawn C. Tope, Kevin Bass, and Clay Nelson] swear that I was in the Freeborn County jail when James Moran was there and seen [sic] that he needed medical attion [sic] and did not get it. His face and neck were swollen. For days up to weeks at a time. [sic]. As I seen he was in a lot of pain. [sic]. He did not eat nor [sic] come out of his cell for days because of the pain. He needed medical help and did not get it. I swear to that.

<u>Id.</u> at Exh. S.

The Plaintiff further reported that, if given the opportunity, he would like to secure testimony from his mother, and some of the staff at the Detention Center. The Plaintiff contends that such testimony would support his assertion that he experienced medical problems, which were neglected by the Defendants. <u>Id.</u>

- 12 -

III.  <u>Discussion</u>

A.     <u>Standard of Review</u>.     Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003); <u>United Fire & Casualty Co. v. Garvey</u>, 328 F.3d 411, 413 (8th Cir. 2003).  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the nonmoving party.  See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/ South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 2004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).  Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir.

2005); <u>Davis v. U.S. Bancorp</u>, 383 F.3d 761, 768 (8th Cir. 2004); <u>Bell Lumber and</u>

<u>Pole Co. v. United States Fire Ins. Co.</u>, 60 F.3d 437, 441 (8th Cir. 1995).

      B.   <u>Legal Analysis</u>.  The Plaintiff alleges that he was denied proper medical

care, during his incarceration at the Detention Center, and specifically, that Peterson

failed to treat him for an infection that had spread from the old stab wound in his neck,

throughout his entire body.  The Defendants maintain that they are entitled to Judgment

as a matter of law because:  1) the Plaintiff has not established any genuine issues of

material fact, which would allow a finding that the Defendants violated the Plaintiff's

constitutional rights; and because 2) Peterson is entitled to qualified immunity.[8]  The

Plaintiff has not submitted any responsive memoranda to the Defendants' Motion.

      As an initial matter, the Plaintiff's action against Mark Harig ("Harig"), who is

the Sheriff of Freeborn County, is necessarily deficient, since the Plaintiff has not

---

      [8]The Defendants also contend that the Freeborn County Jail is not a suable entity.  As we noted in our Order of July 14, 2005, we have construed the Complaint in such a manner that does not include the Jail, as an independent party to the action, but as a description of the place at which the individual Defendants are employed. See, <u>Docket No. 14</u>, at p. 3, n. 1.  In so construing, we noted that, under the law of this Circuit, "county jails are not legal entities amenable to suit," <u>Owens v. Scott County Jail</u>, 328 F.3d 1026, 1027 (8th Cir. 2003), citing <u>De La Garza v. Kandiyohi County Jail</u>, 18 Fed.Appx. 436, 437, 2001 WL 987542 (8th Cir. 2001).  Accordingly, to the extent that the Plaintiff intended to commence an action against the Freeborn County Jail, we would recommend that the claim be dismissed, as a matter of course.

presented any evidence that Harig actually participated in the Plaintiff's medical care or treatment at the Freeborn County Jail.  In order to sustain a claim under Section 1983, a plaintiff must demonstrate that the named defendants were directly and personally involved in the illegal actions, or in the policy decision which created the unlawful context for those actions.  See, e.g., Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001); McNair v. Norris, 2000 WL 490709 at *1 (8th Cir., April 27, 2000); Martin v. Sergeant, 780 F.2d 1334, 1337 (8th Cir. 1985).  Moreover, a warden's, or other official's, "'general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997), quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995); see also, Brisco-Wade v. Carnahan, 149 F. Supp.2d 891, 899 (E.D. Mo. 2001); Krein v. Norris, 2001 WL 33406651 at * 3 (E.D. Ark., May 19, 2000).  Accordingly, in the absence of any evidence that Harig was involved in the medical treatment of the Plaintiff, or that he failed to properly train, supervise, or control the actions of Peterson, we find  that there are no genuine issues of material fact, which would allow the Plaintiff to succeed in his claims against Harig.  Therefore, Harig is entitled to Judgment as a matter of law.

As noted, the Defendants have asserted that the Plaintiff's claims against Peterson are deficient because Peterson is entitled to qualified immunity. When qualified immunity is asserted in a Section 1983 action, we "must first consider the threshold question of whether, construed in a light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." Andrews v. Fuoss, 417 F.3d 813, 816 (8th Cir. 2005), quoting Crow v. Montgomery, 403 F.3d 598, 601 (8th Cir. 2005); see, Wilson v. Layne, 526 U.S. 603 (1999) [citations omitted]. "Only then do we ask whether that right was clearly established at the time of the alleged violation." Id.; see Coonts v. Potts, 316 F.3d 745, 750 (8th Cir. 2003), citing Siegert v. Gilley, 500 U.S. 226, 232 (1991). Here, we find no constitutional violation but, nonetheless, we proceed to address the qualified immunity question in the interests of completeness.

      1.    The Constitutional Claim. While the Plaintiff does not identify the Constitutional provision, upon which his claim is predicated, the nature of the Plaintiff's allegations suggest that he is attempting to assert a violation of the Eighth Amendment. It is well-established that deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). "A prisoner's Eighth Amendment rights are violated if prison

officials show 'deliberate indifference' to the prisoner's 'serious medical needs.'" Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir. 2003), quoting Estelle v. Gamble, supra at 106.  To prevail on a claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997), citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997).  "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."  Id.

"Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment."  Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002).  However, the "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  Finnegen v. Maire, 405 F.3d 694, 696 (8th Cir. 2005), quoting Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000), quoting in turn Estate of Rosenburg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); see also, Roberson v. Bradshaw, 198 F.3d 645, 647 (8th  Cir. 1999)

("'Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.'"), quoting <u>Dulany v. Carnahan</u>, supra at 1239; <u>DeGidio v. Pung</u>, 920 F.2d 525, 532 (8th Cir. 1990)("[T]he eighth amendment does not transform medical malpractice into a constitutional claim.").

Here, the Plaintiff has failed to establish a genuine issue of material fact that would allow him to recover on an asserted Eighth Amendment violation.  Specifically, the Plaintiff has failed to establish that his alleged injuries constitute an objectively serious medical need.  See, <u>Aswegen v. Henry</u>, 49 F.3d 461, 464 (8th Cir. 1995)("To constitute an objectively serious medical need or deprivation of that need * * * the need or deprivation alleged must either be obvious to the layperson or supported by medical evidence, like a physician's diagnosis."), citing <u>Bayerbach v. Sears</u>, 49 F.3d 1324, 1326-1327 (8th Cir. 1995); <u>Thomsen v. Ross</u>, 368 F. Supp.2d 961, 973 (D. Minn. 2005)("Absent a medical diagnosis, a 'serious medical need' is 'one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"), quoting <u>Coleman v. Rahija</u>, supra at 784.

Construed liberally, the Plaintiff's Complaint alleges that he suffered from persistent infections, during his period of incarceration, which resulted from an old stab wound to his neck.  Unfortunately for the Plaintiff, the Record is devoid of any

evidence which would suggest that the Plaintiff was ever diagnosed, or treated for  an

infection during his incarceration, or that the Plaintiff exhibited symptomatology which

would have made it obvious to a lay person that the Plaintiff was suffering from such

an infection.  On the contrary, the Record reflects that the Plaintiff was examined by

Peterson, shortly after each of his requests for medical attention, and that, on each

occasion, the Plaintiff displayed normal vital signs; he did not appear to be in any kind

of acute distress; and he did not express any loss of appetite.  Moreover, as was

reported by Peterson, following her examination of December 4, 2004, the Plaintiff did

not exhibit any limited range of motion in his neck; his tonsils and ears were free of

redness or swelling; and Peterson was unable to palpate any enlarged lymph nodes in

the Plaintiff's neck.  Peterson made similar observations, in her other examinations of

the Plaintiff, and aside from a buildup of earwax, and problems related to the

Plaintiff's dental hygiene, no symptoms were noted, which would provide a basis for

Peterson, or anyone else, to suspect that the Plaintiff was suffering from an infection,

or other objectively serious medical need.

　　　Moreover, the observations that were made during Peterson's examinations

were consistent with the Plaintiff's medical history, as that history was related to  her

in the medical records from the Owatonna Hospital, and the Mayo Health System.

Notably, at the time of his discharge from St. Mary's Hospital, the Plaintiff's wound was healthy; he had no pain in swallowing; no emergency condition; and no direction for ongoing therapy, or care.  Furthermore, contrary to the Plaintiff's representations to Peterson, his admission to the Owatonna Hospital, in July of 2004, did not involve treatment for an infection, but instead, involved treatment for the Plaintiff's reported back pain.  At that time, the Plaintiff did not report any other specific concerns or problems.

Considering the absence of any medical evidence to support the Plaintiff's allegation, the Plaintiff has failed to demonstrate the existence of an objectively serious medical condition, as a matter of law.  Moreover, in the absence of any medical evidence of an infection, the Affidavits, which ostensibly were submitted by Tope, Bass, and Nelson, on behalf of the Plaintiff, are insufficient to establish a genuine issue of material fact concerning the presence of an objectively serious medical condition. See, Brooks v. Gomez, 1999 WL 191440 at *1 (9th Cir., March 19, 1999)("Affidavits from other inmates stating that [the plaintiff] received no relief from the treatments provided by prison officials * * * [did] not establish genuine issues of material fact because the statements are based upon only what [the plaintiff] told them and not on independent knowledge or medical expertise.").

Since we find no genuine issue of material fact that would allow the Plaintiff to prove a constitutional violation, we recommend that the Defendants' Motion be granted, and that the Complaint be dismissed.   Furthermore, even if the alleged conduct were sufficient to raise a constitutional claim, Summary Judgment would still be proper, as Peterson is entitled to qualified immunity.

        2.    <u>Qualified Immunity</u>.  Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See, <u>Wilson v. Layne</u>, supra at 609; <u>Young v. Harrison</u>, 284 F.3d 863, 866 (8th Cir. 2002); <u>Winters v. Adams</u>, 254 F.3d 758, 766 (8th Cir. 2001).  "To withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right." <u>Mettler v. Whitledge</u>, 165 F.3d 1197, 1202 (8th Cir. 1999); see also, <u>Young v. Harrison</u>, supra at 866-67.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." <u>Wilson v. Layne</u>, supra at 614.  The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent."  <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987).  Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'"  <u>Bagby v. Brondhaver</u>, 98 F.3d 1096, 1098 (8ᵗʰ Cir. 1996).

Here, we have concluded that Peterson's treatment of the Plaintiff did not violate the Constitution but, even if it had, Peterson is clearly entitled to qualified immunity, as the unlawfulness of that treatment was far from apparent.  Notably, the Plaintiff was examined shortly after each of his requests for medical attention, and he was treated in manner that was consistent with the symptoms that were reported, and exhibited, during those examinations.  The fact that the Plaintiff did not exhibit the

symptomatology, which would have alerted Peterson to the presence of an infection, is consistent with the treatment that he received from Peterson.   Therefore, we recommend that the Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment be granted, and the Complaint be dismissed in its entirety.

NOW, THEREFORE, It is –

RECOMMENDED:

That the Defendants' Motion for Summary Judgment [Docket No. 24], be granted, and that the Plaintiff's Complaint [Docket No. 1] be dismissed with prejudice.

Dated:  August 4, 2006                    s/Raymond L. Erickson

                                          Raymond L. Erickson
                                          CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 21, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.   Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 21, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.